IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RONALD CLYDE SNELL, #149406,        )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        CASE NO. 2:12-CV-1075-WHA
                                    )               [WO]
                                    )
LEEPOSEY DANIELS, et al.,           )
                                    )
            Defendants.             )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is pending before the court on a complaint filed by

Ronald Clyde Snell challenging conditions of confinement to which he was subjected

during a prior term of incarceration at the Elmore Correctional Facility ("Elmore").[1]  The

plaintiff names Leeposey Daniels and Leon Bolling, wardens assigned to Elmore at the

time of the actions about which he complains, Kim Thomas, former commissioner of the

Alabama Department of Corrections, Governor Robert Bentley, and numerous correctional

officers assigned to Elmore as defendants in this cause of action.[2]  The plaintiff seeks a

---

[1]Snell is now incarcerated at the Bullock Correctional Facility.

[2]It is clear from the complaint that Snell presents claims against the defendants in both their official and individual capacities.  "[W]hen officials sued in [their official] capacity in federal court die or leave office, their successors automatically assume their roles in the litigation."  *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991).  Thus, with respect to Snell's claims against former commissioner Thomas in his official capacity, current commissioner Jefferson Dunn is the appropriate defendant.  As to the personal or individual capacity claims lodged against defendant Thomas, Thomas remains a proper defendant.  *Walton ex rel. R.W. v. Montgomery County Bd. of Educ.*, 371 F. Supp. 2d 1318, 1320 n.1 (M.D. Ala. 2005) (new official substituted for official capacity claim but not

declaratory judgment, injunctive relief and "any and all relief to which [he] is entitled." *Amendment to the Complaint - Doc. No. 3* at 8. The court construes this latter "catch all" request for relief as one which encompasses a request for both compensatory and nominal damages.[3]

The defendants filed special reports and supporting evidentiary materials addressing the plaintiff's claims for relief. Pursuant to the orders entered in this case, the court deems it appropriate to treat these reports as a motion for summary judgment. *Order of March 18, 2013 - Doc. No. 38*. Thus, this case is now pending on the defendants' motion for summary judgment. Upon consideration of this motion, the evidentiary materials filed in support thereof, the sworn complaint, and the plaintiff's affidavit in response to the reports, the court concludes that the defendants' motion for summary judgment is due to be granted.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th  Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule

---

for individual capacity claim).

[3]"Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003)

56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[4]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials, affidavits and declarations under penalty of perjury], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (moving party has initial burden of showing there is no genuine dispute of material fact for trial).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact with respect to the claims presented by the plaintiff. Based on the foregoing, the burden shifts to the plaintiff to establish, with appropriate

---

[4]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*. "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Despite these stylistic changes, the substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, declarations under oath, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-594 (internal quotation marks omitted) (Once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or sworn statements], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.).  This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment.  *Peebles v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Public Education for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007).

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of
> professional judgment.  In respect to the latter, our inferences must accord

> deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted).  Consequently, to survive the defendants' properly supported motion for summary judgment, Snell is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*.  "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Anderson*, 477 U.S. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment.  *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions . . ., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment.");  *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing

5

beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment."); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (summary judgment appropriate where no genuine dispute of material fact exists).  At the summary judgment stage, this court must "consider all evidence in the record . . . [including] pleadings, depositions, interrogatories, affidavits, etc. -- and can only grant summary judgment if everything in the record demonstrates that no genuine [dispute] of material fact exists."  *Strickland v. Norfolk Southern Railway Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004).  What is material is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no

genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After such review, the court finds that Snell has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment. *Matsushita*, *supra*.

## III.  DISCUSSION

### A.  Claims for Relief

In the complaint and amendments thereto, Snell alleges that during his incarceration at Elmore the facility was overcrowded, understaffed and underfunded causing a myriad of alleged unconstitutional conditions. Specifically, Snell asserts that: (1) Correctional

officers failed to provide adequate security which resulted in inmates committing rules violations and criminal acts, including possession of contraband, trade of contraband items, theft from other inmates, credit card scams and assaults on both inmates and correctional officers;[5] (2) He did not receive the benefit of rehabilitation programs; (3) He was denied access to the courts because the defendants failed to properly utilize the Institution Contingency Fund ("ICF") to purchase supplies/equipment for use by inmates in pursuing legal matters and did not allow him extra time in the law library;[6] (4) The defendants permitted inmate barbers to cut hair in an outside area near the entry to the dining hall; and (5) The defendants allowed inmates to smoke both cigarettes and marijuana in the dorms of the facility resulting in his exposure to second hand smoke which constituted a violation of both his constitutional rights and the Alabama Clean Air Act. Snell further asserts that the actions of the defendants constituted criminal acts subject to prosecution, violated state civil statutes and circumvented administrative regulations.

## B.  Absolute Immunity

To the extent Snell sues the defendants in their official capacities, they are immune from monetary damages.  Official capacity lawsuits are "in all respects other than name,

---

[5]Snell identifies contraband as controlled substances, prison-made knives  and cell phones.

[6]"The primary purpose of the Institution Contingency Fund (ICF) is to provide certain materials and services for the benefit and welfare of the inmate population not otherwise provided with appropriated funds." *Administrative Regulation No. 110, § 1.*  The Alabama Department of Corrections designates certain revenues to fund the ICF, including a percentage of canteen profits, interest earned on inmate accounts and ICF savings, vending/store commissions, revenues generated from barber, shoe shine and picture services and private donations to the ICF.  *Id.* at  *§ II(A)(1-5) and § II(B).*

. . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

### C.  Speculative Claims

Insofar as Snell presents claims based on a fear of conditions or actions which could at sometime occur, these claims do not warrant constitutional protection. Mere suppositious allegations that conditions ***could*** subsequently result in constitutional

10

violations and/or that prison officials **may** at some time in the future act unfavorably towards an inmate fail to implicate a constitutionally protected interest. *Conner v. Sticher*, 801 F.2d 1266, 1268 (11th Cir. 1986) (plaintiff's subjective belief harm may occur provides no basis for relief); *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (jurisdiction cannot be premised upon mere speculation); *Carter v. Heard*, 593 F.2d 10 (5th Cir. 1979) (Relief is not warranted when "the injury which [plaintiff's] pleadings contemplate is fancied, not real; prospective, not actual; and imagined, not threatened."). Thus, claims based on possible future adverse action are subject to dismissal as these claims are purely speculative and without constitutional implication.

### D.  Lack of Standing - Claims Alleged on Behalf of Other Inmates

Standing is a cornerstone of American jurisprudence on which jurisdiction lies. "[A] litigant may only assert his own constitutional rights or immunities." *McGowan v. Maryland*, 366 U.S. 420, 429 (1961), citing *United States v. Raines*, 362 U.S. 17, 22 (1960); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 218-219 (1974) (plaintiff must assert a legally cognizable injury in fact before federal courts have jurisdiction).  "The essence of a standing question is whether the plaintiff has alleged 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions[.]' *Baker v. Carr*, 369 U.S. 186, 204, 82

S.Ct. 691, 703 7 L.Ed.2d 663 (1962)." *Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th Cir. 1987); *Harris v. McRae*, 448 U.S. 297, 320 (1981) (same).

Standing involves two aspects. The first is the minimum "case or controversy" constitutional requirement of Article III. *Saladin*, 812 F.2d at 690. "To satisfy this 'irreducible' constitutional minimum required for standing, a litigant must show 1) that he personally has suffered an actual or prospective injury as a result of the putatively illegal conduct; 2) that the injury can be fairly traced to the challenged conduct; and 3) that the injury is likely to be redressed through court action." *Saladin*, 812 F.2d at 690, citing *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472 (1982); *Warth v. Seldin*, 422 U.S. 490, 499 (1975). If any element is lacking, a plaintiff's claim is not viable. In addition, the Supreme Court has established several requirements based on prudential considerations. *Saladin*, 812 F.2d at 690 (internal citations omitted) ("The Supreme Court has also stated that, in addition to these essential constitutional requirements, a court should consider the case in light of three principles which might counsel judicial constraint, referred to as 'prudential' considerations. . . . Those considerations are 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and 3) whether the plaintiff is asserting

his or her own legal rights and interests rather than the legal rights and interests of third parties.").

The instant complaint contains several claims relative to conditions of confinement and adverse actions by correctional officials to which other inmates may have been or were subjected during their confinement at Elmore. In accordance with applicable federal law as set forth herein, Snell lacks standing to assert the constitutional rights of other persons. *Saladin*, *supra.*; *Allen v. Wright*, 468 U.S. 737, 751 (1984). The prudential limitation applicable in this case is that a litigant may not assert the legal rights or interests of another person. With respect to the claims arising from alleged violations of other inmates' constitutional rights, Snell is not "asserting [his] . . . own legal rights and interests [but] rather . . . the legal rights and interests of third parties." *Saladin*, 812 F.2d at 690. These claims therefore entitle Snell to no relief and summary judgment on such claims is due to be granted in favor of the defendants.

### E. Conditions Claims for Which Standing Exists

The correctional defendants deny that the conditions made the basis of the instant complaint rise to the level of constitutional violations. Warden Daniels addresses these claims as follows:

> My security staff and I work diligently to provide all of the inmates at Elmore Correctional Facility a safe and humane environment in which to live by enforcing all policies, procedures, rules an regulations. Danger exists in all prisons. It is not limited to Elmore Correctional Facility. It is true that

13

knives and drugs have been found in Elmore Correctional Facility, but I deny the amounts are massive or excessive [as alleged] and I deny having any personal knowledge of their existence [prior to discovery by correctional officers].

I also deny having personal knowledge that a massive number of inmates have contraband such as cell phones in their possession. It is true that some of the inmates at Elmore Correctional Facility have been found to have cell phones in their possession, but as soon as we are aware they have them, the cell phones are confiscated and the inmates are disciplined. It is a fact that my security staff often finds contraband such as drugs and cell phones that inmates' visitors attempt to bring in when they come to visit, or are thrown over the fence or are dropped off on property before they get in inmates' possession. We periodically have a Critical Response Team (CERT) come in to conduct a shakedown of all inmates and their living areas. We often have a K-9 team come in an effort to locate any drugs that may be inside Elmore Correctional Facility.

I deny that my Lieutenants and Sergeants do not make security checks of the facility during their tour of duty. If they notice a Correctional Officer violating any rule or policy, that officer is appropriately disciplined. My staff and I appropriately handle all known assaults, whether they be inmate-on-inmate, inmate-on-staff or staff-on-inmate, according to the rules and policies governing such actions. I have no personal knowledge of any employee at Elmore Correctional Facility being a member of a gang.

I deny that any member of my staff and I are intentionally exposing any inmate at Elmore Correctional Facility to danger of actual death at all times.

I deny that any member of my staff and I have denied any inmate meaningful and adequate access to the courts. I also deny that the Law Library Officer at Elmore Correctional Facility, who is Correctional Officer Althea Jones, has not been adequately trained to perform the duties of the Law Library Officer. Officer Jones and her immediate supervisor, Correctional Captain Charles Mckee, are aware that inmates have a right to access the courts. The responsibilities of the Law Library Officer and the procedures governing the operation and use of the Law Library are listed in Elmore Correctional Facility's Standard Operating Procedure No. 533, a copy of which is attached. The hours listed in the SOP give inmates sufficient access to the Law Library. Inmates who enter the Law Library [or request a legal package] are issued a package of supplies once a week that

consists of ten (10) sheets of paper, two (2) sheets of carbon paper, and two (2) envelopes.  They are required to sign for the package.  They can request additional supplies that will be issued on a case-by-case basis.       I deny that I am directly responsible for the violence, beatings, stabbings and criminal activities that occur at Elmore Correctional Facility.  I also deny these type activities occur each day.  As aforesaid, my staff and I work diligently to provide a safe and humane environment for all of the inmates to live in by enforcing the policies, procedures, rules, and regulations. . . .

I deny that I have acted with deliberate indifference to decrease the prison population. I am well aware that a majority of prisons are overpopulated and are also understaffed. I do not have the authority to enact policies that would decrease any prison's population or would provide enough funds for operating any prison.

I deny that any of my security or support supervisors and I deliberately allow employees to sleep on the job, to work more overtime hours than they are allowed, and to bring contraband such as drugs and cell phones into Elmore Correctional Facility.  I, myself, often make rounds throughout Elmore Correctional Facility, as does my Assistant Warden and my Security Captain, to check on security and cleanliness and to converse with inmates. The Shift Commanders (Lieutenants and Sergeants) also make these tours [of the facility].  Employees, whether they are security or support employees, who are caught violating any of the rules, policies and procedures addressed in the Alabama Department of Corrections Administrative Regulation 208, a copy which is attached, are appropriately disciplined.

I deny that I have intentionally violated any health laws of the State of Alabama.  Inmates' haircuts do not take place where food is being prepared, served or eaten.  When the barbers are cutting hair, they are set up outside the kitchen, and their proximity is nowhere near any area where food is being prepared, served or eaten.  Inmates are identified as needing haircuts as they are exiting the kitchen [thereby negating the possibility of loose hair entering the kitchen].  My staff and I are responsible to ensure inmates are well groomed and sanitary.

I deny that my staff and I violate Alabama's Clean Air Act by knowingly allowing a mass number of inmates to smoke in the dorms without punishment.  When inmates are caught smoking in the dorms [or other smoke-free areas] they are appropriately disciplined.  Any member of my staff who is caught violating the smoke-free policy is also appropriately

disciplined.[7]

I deny that any member of my staff and I allow inmates to move from the bed to which the ICS office assigned them to the bed of their choice in order to commit illegal acts.

I deny that any member of my staff and I turn from our security duties and look away to allow known gang members to commit criminal acts in hiding zones they have created under their own authority.

My staff and I have been made well aware that some inmates have committed credit card scams for which they have been appropriately disciplined. My staff and I have not authorized over-the-amount purchases to be made, have not authorized store workers to charge for store draw assistance, and have not authorized store workers to visit dorms to pick up store slips from known credit card scammers.

*Exh. B to the Defendants' Special Report - Doc. No. 37-2* at 1-5 (footnote added); *Exh. C to the Defendants' Special Report - Doc. No. 37-3* at 1-5 (same).

Lt. Susan Clemons, a defendant in this case, filed an affidavit in response to the plaintiff's claims in which she states as follows:

I deny each and every allegation inmate Snell addressed in his complaint. I have never intentionally violated any inmate's Constitutional Rights nor have I ever had any disciplinary action in [my] entire 20 plus years as a correctional employee of having intentionally violated any inmate's Constitutional Rights.

My security staff and I work diligently to provide all inmates at the Elmore Correctional Facility a safe and humane environment in which to live by enforcing all policies, procedures, rules and regulations. We work in an

---

[7]The Alabama Department of Corrections ["ADOC"] adopted a Smoke/Tobacco Free Policy in December of 2004. This policy reads, in pertinent part, as follows:

It is the policy of the ADOC that all ADOC owned or leased buildings, facilities, and vehicles will be smoke-free. . . . Smoking is strictly prohibited within all ADOC building[s]/institutions. . . . Smoking will be permitted outside all buildings/institutions only at designated smoking areas. Designated smoking areas will not be closer than ten (10) feet to the entrance of the building/institution. A fire resistant receptacle for cigarette butts will be available in this area. . . . "Non-smoking" signs shall be posted at all building entrances and throughout the building.

*http://www.doc.state.al.us*

environment that incarcerates various types of offenders, some of which are violent and dangerous, this is the reason that our Department exists, to house these felons, so for obvious reasons at time[s] danger will exist in all prisons to include Elmore Correctional Facility.  I acknowledge that drugs, knives and cell phones have been found and continue to be found at Elmore Correctional Facility, no more or less than they are found in any other Department of Corrections institution.  I deny that they are found in massive or excessive amounts and I deny having personal knowledge of their existence [prior to discovery by correctional officers of which I am made aware].  Immediately, upon having any knowledge of weapons, drugs, cell phones or other contraband being in the possession of any inmate within the institution or in the institution itself, I institut[e] a search to locate the above mentioned contraband in order to ensure the safety of the inmates and staff.  All inmates found to have contraband in their possession are properly disciplined.  All contraband confiscated either from inmates or other areas [is] properly disposed of in accordance with [the applicable] Administrative Regulation.  All inmates are randomly searched for contraband in an effort to find and discard contraband and keep all staff and inmates safe.  I am the Shift Commander of 2nd Shift and I ensure that all dorms are visited on a daily basis by a supervisor.  All known incidents of inmate on inmate, inmate on staff and staff on inmate assaults or other physical or verbal altercations are swiftly investigated, documented and all parties appropriately disciplined or punished in accordance with Administrative Regulation(s) #403 and #208.  Any officer or ADOC employee caught violating a policy, rule or regulation is appropriately disciplined in accordance with Administrative Regulation #208.  I have never nor am I aware that any employee under my supervision has ever [been] a gang member or [is] intentionally exposing any inmate at Elmore Correctional Facility to danger of actual death 'at all times'.  I am not directly responsible for any violence, beatings, stabbings and/or criminal activities that occur at Elmore Correctional Facility and I deny that they occur on a daily basis.  It is a well-known fact . . . that a majority of all prisons are overpopulated and understaffed, however I am not directly responsible for that either.  I do not have the authority to allocate the funds for operating any prison.  As a security supervisor, I do not deliberately allow any employee to sleep on the job, work more overtime hours than they are allowed to or bring in contraband such as drugs or cell phones into Elmore Correctional Facility.  My supervisors and I diligently and regularly conduct employee searches to find contraband and eliminate any employee attempting

17

to introduce contraband into the institution.  I deny that I or my employees violate health laws by allowing inmates to smoke in the dorms or inmates to violate our grooming rules.  All inmates are required to maintain their grooming habits, i. e., haircut, shave, clippered fingernails.  All inmates are required to turn their sheets in once a week to be laundered and clothing five days a week to be laundered by our laundry.  Inmates are not allowed to randomly move to the bed of their choice and any inmate found on a bed not assigned to them, they are moved by my staff to their assigned bed and appropriately punished.  I am aware that some inmates have attempted to commit credit card scams and those inmates who have been identified, have been appropriately punished.  I have no knowledge as to any additional claims raised by the Plaintiff.

*Exh. G to the Defendants' Special Report - Doc. No. 37-7* at 1-3.  Additional evidentiary materials filed by the defendants demonstrate that Snell was routinely allowed access to legal materials and received several legal kits to aid in the preparation of legal documents.

*Exh. R to the Defendants' Supplemental Special Report - Doc. No. 44-6* at 1-10.  In addition, these materials show that barbers are provided appropriate chemicals for the sterilization of barbering tools regardless of where an inmate receives his haircut and, despite lack of running water in the barber shed or the area outside the dining hall, running water and nearby restroom facilities were available to the barbers as were chemicals used to sterilize the barbering tools.

Snell filed a response in opposition to the correctional defendants' special reports supported by his affidavit.  In his response, Snell argues that the defendants failed to furnish the court with the precise number of violent acts/rules violations committed at Elmore and totally disregarded the need for security of the institution.  *Plaintiff's Affidavit*

18

*in Response to the Defendants' Reports - Doc. No. 48* at 1-2.  He also alleges that the potential lack of ample time in the law library and the possible denial of sufficient materials, i.e., paper and computer access, could prejudice him prior to filing a case or during its litigation.  *Id*. at 3-4.

Although overcrowding and under staffing exists in the Alabama prison system, these facts, standing alone, are not dispositive of the issues before this court.  Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain.  *Id*. at 346.  Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Id*. at 348 (citation omitted).  Prison conditions which may be "restrictive and even harsh, [ ] are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment.  *Id*.  Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345-346.  "'[T]he Constitution does not mandate comfortable prisons.'  *Id.* at 349, 101 S.Ct. at 2400.  If prison conditions are merely 'restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.'  *Id.* at 347, 101

S.Ct. at 2399.   Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they 'involve the wanton and unnecessary infliction of pain.' *Id.*"  *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004).   Although the Constitution "does not mandate comfortable prisons . . . neither does it permit inhumane ones."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349). Thus, it is well-settled that the conditions under which a prisoner is confined are subject to constitutional scrutiny.  *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer,* 511 U.S. at 832  (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-527 (1984)); *Helling,* 509 U.S. at 31-32.  For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health."  *Chandler v. Crosby*, 379 F.3d 1278, 1289-1290 (11th Cir. 2004).   To demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry.  *Farmer*, 511 U.S. at 834.  In *Farmer*, the Court identified the objective and subjective elements necessary to establish an Eighth Amendment violation.  With respect to the requisite objective elements,  an inmate must first show "an objectively substantial risk of serious

harm . . . exist[ed].   Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d 1028-1029.   As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .   The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  . . . ***[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment***."  *Farmer*, 511 U.S. at 837-838 (emphasis added); *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Snell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).   The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . .   It is ***obduracy and wantonness, not inadvertence or error in good faith***, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added).

The conditions within a correctional facility will constitute cruel and unusual

punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] . . . [are] grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes*, 452 U.S. at 347. "Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency. . . . But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*. at 347. To determine whether conditions of confinement constitute cruel and unusual punishment, the court must look to the effect the condition has upon the inmate. *Id*. at 366. In a case involving conditions generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards. *Hamm v. De Kalb County*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied Hamm v. De Kalb County*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L. Ed. 2d 894 (1986); *see also Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991). The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need. . . . To say that some prison conditions may interact in this fashion is a far cry from saying that all

22

prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 304-305 (1991) (emphasis in original).

A prison official may likewise be held liable under the Eighth Amendment for acting with "'deliberate indifference'" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 1974 (1994).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991). . . . Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003). "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted). As the foregoing makes clear, "[m]erely negligent failure to protect an inmate . . . does not justify liability under

section 1983. . . ." *Id*.

(i)  <u>Lack of Security</u>.  Snell asserts that the defendants failed to provide adequate security at Elmore.  In support of this assertion, Snell argues that Elmore should have been staffed with additional correctional officers.  He also alleges that the officers assigned to Elmore generally ignored their responsibilities and slept while on duty.

In this instance, Snell's assertion that Elmore operated with a shortage of correctional officers is not, by itself, sufficient to show that the defendants acted with deliberate indifference to an objectively, sufficiently serious threat of harm.  *Farmer*, 511 U.S. at 834.  Moreover, with respect to the general and conclusory allegations regarding inattentive officers, Snell has failed to demonstrate any deliberate indifference or reckless disregard by the named defendants with respect to his safety.  Specifically, Snell has failed to identify any particular incident from which the defendants could infer that a substantial risk of serious harm existed to him.  Even had he done so, the record is devoid of any evidence showing that the defendants drew the requisite inference and then ignored a substantial risk to Snell's safety.  Consequently, summary judgment is due to be granted in favor of the correctional defendants on the claims regarding institutional security.  *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *see also Carter*, 352 F.3d at 1349-1350.

(ii)  <u>Breaking of Rules and Laws by Other Inmates</u>.  Initially, the court finds that

correctional officials are not liable for the actions of recalcitrant inmates who chose to act in violation of institutional rules or criminal laws. To the extent this assertion can be construed to allege a claim of deliberate indifference to the plaintiff's safety arising under the Eighth Amendment, the court concludes that this claim entitles Snell to no relief.

In the evidentiary materials filed by the defendants, they adamantly deny acting with either callous disregard or deliberate indifference to Snell's safety. Specifically, Warden Daniels asserts that he, along with the correctional staff at Elmore, strive to enforce all institutional rules and regulations to prevent violations thereof by inmates and staff. *Exh. B to the Defendants' Special Report - Doc. No. 37-2* at 2-3. Snell presents no evidence of an objectively substantial risk of serious harm nor is there any evidence demonstrating an actual, subjective awareness by the defendants of a substantial risk of such harm to Snell, each of which is a required element of this Eighth Amendment claim. Neither an assertion that the defendants should have known of potential dangers at Elmore nor the mere possibility that Snell could have been be injured by other inmates demonstrates a genuine issue regarding deliberate indifference on the part of the defendants. *Brown*, 894 F.2d 1537. "Plaintiff has failed to establish that the Defendant[s] had a subjective awareness of a substantial risk of serious physical [harm] to Plaintiff; thus, Plaintiff has failed to establish a required element of this claim. When viewing the evidence most favorably toward Plaintiff, a claim for deliberate indifference has not been established. . . ." *Carter*,

352 F.3d at 1350 (footnote omitted).   Thus, the defendants are entitled to summary

judgment.  *Id*.

(iii)   <u>Second Hand Smoke</u>.   Snell complains that the defendants have failed to

protect him from exposure to second hand smoke, commonly identified as environmental

tobacco smoke ("ETS").

> [A] prisoner can state a cause of action under the Eighth Amendment for
> exposure to ETS [or second hand smoke] by "alleging that [prison officials]
> have, with deliberate indifference, exposed him to levels of ETS that pose an
> unreasonable risk of serious damage to his future health."  *Helling*, 509 U.S.
> at 35, 113 S.Ct. 2475. As for the objective factor, the prisoner must show that
> he himself is being exposed to unreasonably high levels of ETS.  *Id*.
> Relevant facts will include whether the prisoner remains housed in the
> environment and whether the facility has enacted a formal smoking policy.
> *Id*. at 35-36, 113 S.Ct. 2475.  The objective factor further considers "a
> scientific and statistical inquiry into the seriousness of the potential harm and
> the likelihood that such injury to health will actually be caused by exposure
> to ETS . . . [and] also requires a court to assess whether society considers the
> risk that the prisoner complains of to be so grave that it violates
> contemporary standards of decency to expose anyone unwillingly to such a
> risk."  *Id*. at 36, 113 S.Ct. 2475 (emphasis in original). As for the subjective
> factor, the prisoner must show that prison authorities demonstrated a
> "deliberate indifference" to his plight.  *Id*.  The adoption of a smoking policy
> "will bear heavily on the inquiry into deliberate indifference."  *Id*.

*Kelley v. Hicks*, 400 F.3d 1282, 1284 (11th Cir. 2005).

In this case, Snell challenges his exposure to second hand smoke and references the

possibility of future health problems which could result from this exposure.  Snell asserts

that his exposure to the smoke is directly related to the defendants' failure to properly

enforce the no-smoking policy adopted by the ADOC.  The evidentiary materials submitted

by the defendants refute the plaintiff's conclusory allegations that they failed to enforce the no-smoking policy and, thereby, knowingly exposed him to excessive amounts of second hand smoke.

Snell fails to proffer any evidence, other than his own self-serving statements, that he was exposed to levels of second hand smoke which posed an unreasonable risk to his health. Consequently, Snell "fails to objectively show that he was exposed to unreasonably high levels of ETS and that the risk to his health was so 'grave' as to 'violate contemporary standards of decency.'" *Hicks*, 400 F.3d at 1285. Additionally, even if Snell could satisfy the objective factor of his claim, he fails on the subjective component. The record is completely devoid of any evidence that the defendants had knowledge of specific facts from which an inference could be drawn that a substantial risk of harm existed to Snell, that the defendants actually drew this inference and thereafter ignored the attendant risk of harm. Snell has therefore also failed to establish the essential element of subjective awareness on the part of the defendants. *Hicks*, 400 F.3d at 1285; *Carter*, 352 F.3d at 1350. Consequently, Snell has not shown that the defendants, acting with deliberate indifference, exposed him to levels of second hand smoke which posed an unreasonable risk of harm to his health and, hence, summary judgment is due to be granted in favor of the defendants on this claim.

(iv) <u>Inmate Hair Cuts</u>. Snell alleges that use of an area outside of the kitchen for

inmate hair cuts violated his constitutional rights.  The defendants adamantly deny this allegation and maintain that the area in which inmates received hair cuts was a safe distance from where food was prepared, served and eaten.  The defendants further assert that correctional officers instructed inmates who needed hair cuts to report to the outside area as they exited the dining hall thereby lessening the chance of loose hair being transferred into the food service area.  Initially, it is clear that utilizing an area outside of the dining hall to provide hair cuts to inmates did not present a severe or extreme condition which posed an unreasonable risk of serious harm to Snell's health or safety.  *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004).  It is likewise clear that use of this area did not deprive Snell "of the minimal civilized measure of life's necessities" so as to violate the Eighth Amendment.  Thus, this claim does not rise to the level of a constitutional violation.

(v)  <u>Rehabilitation Programs</u>.   Snell contends that the denial of access to rehabilitation programs is violative of his constitutional rights.   An inmate has no constitutionally protected interest in access to rehabilitative programs as the failure to secure treatment in such programs does not impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin*, 515 U.S. at 484. This claim alleges infringement of a non-existent legal interest and, therefore, provides no basis for relief to Snell.

(vi)  Totality of Conditions.  The court has undertaken a thorough and exhaustive review of the claims presented by Snell, the responses to these claims by the defendants, the probative evidentiary materials submitted by the defendants and the affidavit submitted by Snell in response to the defendants' reports.  After such review, the court finds that the challenged conditions though uncomfortable, inconvenient, unpleasant and/or objectionable were not so extreme as to violate the Eighth Amendment.  *Chandler v. Baird*, 926 F.2d 1057, 1289 (11th Cir. 1991).  Specifically, the totality of the claims before this court do not amount to conditions which fall below applicable constitutional standards as Snell failed to demonstrate that the challenged conditions had "a mutually enforcing effect that produce[d] the deprivation of a single, identifiable human need. . . ."  *Wilson*, 501 U.S. at 304.  "To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes."  *Id*. In addition, even had Snell demonstrated "an excessive risk to [his] health or safety," correctional officials cannot be held liable "solely because of the presence of objectively inhumane prison conditions."  *Farmer*, 511 U.S. at 838.  Snell has presented no specific facts nor produced any evidence indicating that the correctional defendants subjectively knew of a substantial risk of harm and disregarded this risk so as to establish deliberate indifference.  *Id*.; *Carter*, 352 F.3d at 1349 (11th Cir. 2003).

**F.  Access to Court**

Snell alleges that during his confinement at Elmore the defendants deprived him of access to the courts. In support of this claim, Snell asserts that: (1) The research equipment in the law library at Elmore is insufficient to meet the needs of inmates; (2) He did not receive adequate legal supplies; (3) The law library supervisor was not properly trained; and (4) The defendants did not allow him extra time in the law library. Snell maintains that because of these shortcomings he could be prejudiced in this case or future civil actions which may be filed with the courts. *Plaintiff's Affidavit in Response to the Defendants' Reports - Doc. No. 48* at 3.

The law directs that incarcerated persons are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds v. Smith*, 430 U.S. 817, 825 (1977). In *Lewis v. Casey*, 518 U.S. 343 (1996), the Supreme Court clarified and limited the right to assistance recognized in *Bounds*. Specifically, the Court held that "an inmate alleging a violation of *Bounds* must show actual injury" arising from the alleged inadequacies in the law library, legal assistance program or access provided by officials. *Lewis*, 518 U.S. at 349. In identifying the particular right protected by *Bounds*, the Court explained that "*Bounds* established no . . . right [to a law library or to legal assistance]. The right that *Bounds* acknowledged was the (already well-established) right of ***access to the courts***. . . . [P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a

reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'"  *Id*. at 350-351 (emphasis in original) (citations omitted).  The Court further opined *Bounds* did not require "that the State . . . enable the prisoner to **discover grievances**, and to **litigate effectively** once in court. . . .  To demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed largely illiterate prison population is [not something] . . . the Constitution requires."  *Id*. at 354 (emphasis in original).

The Court similarly rejected the argument that the mere claim of a systemic defect, without a showing of actual injury, presented a claim sufficient to confer standing.  *Id*. at 349.  Moreover, *Lewis* emphasized that a *Bounds* violation is related to the lack of an inmate's capability to present claims.  518 U.S. at 356.  "*Bounds*, which as we have said guarantees no particular methodology but rather the conferral of a capability -- the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.  When any inmate . . . shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided, he demonstrates" the requisite actual injury.  *Lewis*, 518 U.S. at 356.  Finally, the Court discerned that the injury requirement is satisfied only when an inmate has been denied "a reasonably adequate opportunity to file nonfrivolous legal claims challenging [his]

convictions or conditions of confinement. . . .  ***[I]t is that capability, rather than the capability of turning pages in a law library, that is the touchstone***." *Id*. at 356-357 (emphasis added).  "[T]he Constitution does not require that prisoners . . . be able to conduct generalized research, but only that they be able to present their grievances to the courts - a more limited capability that can be produced by a much more limited degree of legal assistance." *Id*. at 360.  The Court admonished that federal courts should allow prison officials to determine the best method of ensuring that inmates are provided a reasonably adequate opportunity to present their nonfrivolous claims of constitutional violations to the courts.  *Id*. at 356.  A federal district court must "'scrupulously respect[] the limits on [its] role,' by 'not . . . thrust[ing] itself into prison administration' and instead permitting '[p]rison administrators [to] exercis[e] wide discretion within the bounds of constitutional requirements.' [*Bounds*, 430] U.S. at 832-833, 97 S.Ct. at 1500." *Id*. at 363.

Snell presents only a conclusory allegation of a denial of access to the courts and fails to present any deficiencies with respect to the legal access provided to him during his confinement at Elmore which actually hindered his efforts to pursue claims before this or any other court.  Although Snell alleges that while at Elmore he did not receive adequate physical access to the law library or research tools, it is undisputed that at all times while housed therein correctional officials allowed Snell access to the prison law library and the materials contained in the library.  It is also clear that Snell received legal kits for use in

the preparation of documents he sought to file and also had the ability to obtain supplies from other sources. The evidence establishes that the defendants in no way inhibited his preparation of legal documents, filing of pleadings or processing of any cause of action. Throughout the proceedings in this case, Snell demonstrated he is both proficient and prolific at presenting and arguing the claims of his choice to the court of his choosing. Nothing in the record indicates that the challenged lack of access to materials or research tools improperly impeded or adversely affected Snell's efforts to pursue nonfrivolous legal claims. Snell has utterly and completely failed to come forward with any evidence that the actions about which he complains deprived him of the *capability* of pursuing claims in this or any other court. Hence, Snell fails to establish that he suffered the requisite injury, *Lewis*, 518 U.S. at 356, and the defendants are therefore entitled to summary judgment on the access to courts claim. *Barbour v. Haley*, 471 F.3d 1222, 1225 (11th Cir. 2006) (access to courts claim fails because plaintiff did not show any actual injury); *Chandler v. Baird*, 926 F.2d 1057, 1063 (11th Cir. 1991) (An inmate is entitled to no relief on an access to courts claim in "the absence of any indications of ultimate prejudice or disadvantage.").

## G. Violation of Administrative Regulations

Snell alleges that correctional officials at Elmore violated administrative regulations with respect to security, maintenance and management of the institution. The mere fact that agency regulations or procedures have been violated does not by itself raise a

33

constitutional issue. *United States v. Caceres,* 440 U.S. 741, 751-752 (1979); *Magluta v. Samples,* 375 F.3d 1269, 1279 n. 7 (11th Cir. 2004); *Myers v. Klevenhagen,* 97 F.3d 91, 94 (5th Cir.1996); *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293 (1995); *Harris v. Birmingham Board of Education*, 817 F.2d 1525 (11th Cir. 1987).   Thus, this claim provides Snell no basis for relief.

## H.  Loss of Property

To the extent the complaint can construed to present a challenge to the disbursement of funds from the ICF, Snell is entitled to no relief.

> If the [funds were improperly expended] because of [the defendants'] negligence, there has been no unconstitutional deprivation of property. *See Daniels v. Carr*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (negligent loss of property does not rise to the level of a constitutional violation.)  If [the defendants] intentionally [disbursed the funds in an inappropriate manner], plaintiff has not alleged a constitutional violation.  In *Hudson v. Palmer* the Court ruled that an 'unauthorized intentional deprivation of property by a state employee does not constitute a violation of the Due Process Clause . . . if a meaningful postdeprivation remedy for the loss is available.'  104 S.Ct. at 3202, 82 L.Ed.2d at 407.

*Rodriguez-Mora v. Baker*, 792 F.2d 1524, 1527 (11th Cir. 1986); *Holloway v. Walker*, 790 F.2d 1170, 1173-1174 (5th Cir. 1986) (finding no breach of federally guaranteed constitutional rights, even where high level state employee intentionally engages in tortious conduct, as long as the state system as a whole provides due process).  This court has routinely and consistently applied the holding of *Rodriguez-Mora* to dismiss due process claims brought by inmates challenging actions of state officials regarding deprivations of

property. *McClellan v. Alabama*, Civil Action No. 2:11-CV-466-ID, 2011 WL 3423940 (M.D. Ala. 2011); *Flournoy v. Culver, et al.*, Civil Action No. 1:10-CV-104-ID, 2010 WL 916577 (M. D. Ala. 2010); *Dunklin v. Riley, et al.*, Civil Action No. 2:06-CV-1063-MEF, 2009 WL 3624706 (M.D. Ala. 2009); *Malone v. Boyd, et al*., Civil Action No. 2:09-CV-217-TMH, 2009 WL 1064903 (M.D. Ala. 2009); *Carter v. Valeska, et al.*, Civil Action No. 1:08-CV-858-TMH, 2008 WL 5245618 (M.D. Ala. 2008); *Salmon v. Turner*, Civil Action No. 1:08-CV-554-TMH, 2008 WL 3286982 (M.D. Ala. 2008); and *Todd v. Jones, et al.*, 3:07-CV-1021-WKW, 2007 WL 4510340 (M.D. Ala. 2007).

The State of Alabama, through its Board of Adjustment, provides a meaningful post-deprivation remedy for Snell to seek redress with respect to the expenditure funds from the ICF. *Ala. Code* § 41-9-60 *et seq*. Consequently, Snell's allegation that the defendants violated his constitutional right to due process based on the manner in which they utilized the ICF, whether such was the result of negligence or an intentional act, entitles him to no relief from this court. The defendants are therefore entitled to summary judgment on this claim.

## I. Criminal Prosecution

(i) <u>State Prosecution</u>. Snell seeks state prosecution of the defendants for the actions made the basis of the instant complaint. A "private citizen lacks a judicially cognizable interest in the prosecution or non-prosecution of another." *Linda R. S. v. Richard D.*, 410

U.S. 614, 619 (1973); *Nelson v. Skehan*, 386 Fed.Appx. 783, 786 (10th Cir. 2010) (plaintiff has no constitutional right to have defendants prosecuted); *see also Leeke v. Timmerman*, 454 U.S. 83 (1981).  Consequently, this claim provides no basis for relief.

(ii)  <u>Potential Claims Under 18 U.S.C. § 241 and § 242</u>.  To the extent the complaint can be construed to seek relief for alleged criminal actions purportedly committed in violation of his constitutional rights as prohibited by 18 U.S.C. § 241 and § 242, Snell is entitled to no relief.  "Title 18 U.S.C. § 241 is a statute that criminalizes conspiracies against a person's rights under the Constitution or laws of the United States.  There is no private right of action under this criminal statute.  *Risley v. Hawk*, 918 F.Supp. 18, 21 (D.D.C. 1996), *aff'd*, 108 F.3d 1396 (D.C. Cir. 1997); *Dugar v. Coughlin*, 613 F.Supp. 849, 852 n.1 (S.D. N.Y. 1985). . . .  Title 18 U.S.C. § 242 makes it a crime to willfully deprive persons under color of law of their rights under the Constitution or laws of the United States.  The statute does not create a private cause of action.  *Powers v. Karen*, 768 F.Supp. 46, 51 (E.D.N.Y. 1991), *aff'd*, 963 F.2d 1552 (2nd Cir. 1992); *Dugar v. Coughlin*, 613 F.Supp. 849, 852 n.1 (S.D.N.Y. 1985)."  *Gipson v. Callahan*, 18 F.Supp.2d 662, 668 (W.D.Tex 1997).  A plaintiff is foreclosed "from asserting claims pursuant to 18 U.S.C. §§ 242 and 371 because, as criminal statutes, they do not convey a private right of action. . . . Therefore, the Court must dismiss [Snell's] claims that have been brought pursuant to 18 U.S.C. §§ 242 and 371."  *Rockefeller v. United States Court of Appeals Office for Tenth*

*Circuit Judges*, 248 F.Supp.2d 17, 23 (D.D.C 2003)

### J.  Alleged Violations of State Law - Supplemental Jurisdiction

Snell complains that the actions of the defendants violated various state laws.

Review of any pendent state law claim is only appropriate upon exercise of this court's

supplemental jurisdiction.  In the posture of this case, however, the court concludes that

exercise of supplemental jurisdiction over Snell's referenced state law claims is

inappropriate.

> Two factors determine whether state law claims lacking an independent
> federal jurisdictional basis can be heard in federal court with a federal claim
> over which the court has jurisdiction.  To exercise pendent jurisdiction [or
> what is now identified as supplemental jurisdiction] over state law claims not
> otherwise cognizable in federal court, "the court must have jurisdiction over
> a substantial federal claim and the federal and state claims must derive from
> a 'common nucleus of operative fact.'"  *Jackson v. Stinchcomb,* 635 F.2d
> 462, 470 (5th Cir.1981) (quoting *United Mine Workers v. Gibbs,* 383 U.S.
> 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).  *See generally* C. Wright, A.
> Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3567
> pp. 443-47 (1975).

*L.A. Draper and Son v. Wheelabrator Frye, Inc.*, 735 F.2d 414, 427 (11th Cir. 1984).  The

exercise of supplemental jurisdiction is completely discretionary.  *United Mine Workers*

*v. Gibbs*, 383 U.S. 715 (1966).  "If the federal claims are dismissed prior to trial, *Gibbs*

strongly encourages or even requires dismissal of the state claims."  *L.A. Draper and Son*,

735 F.2d at 428.

In view of the resolution of the federal claims presented by Snell, the court

37

concludes that the pendent state law claims are due to be dismissed. *Gibbs*, 383 U.S. at 726 (if the federal claims are dismissed prior to trial, the state claims should be dismissed as well); *see also Ray v. Tennessee Valley Authority*, 677 F.2d 818 (11th Cir. 1982).  The court therefore declines to exercise supplemental jurisdiction over these claims and makes no determination with respect to the merits of such claims which will be dismissed without prejudice.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The motion for summary judgment filed by the defendants be GRANTED.

2.  Judgment be GRANTED in favor of the defendants on the plaintiff's federal claims.

3.  The state law claims be dismissed without prejudice

4.  This case be dismissed.

5.  Costs be taxed against the plaintiff.

It is further

ORDERED that on or before November 2, 2015 the parties may file objections to this Recommendation.  Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised

that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 19th day of October, 2015.


     /s/Charles S. Coody     
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE